UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JOSE RAMIREZ**,

        Plaintiff,

  v.

**LINCARE, INC.**, a corporation,

        Defendant.

Case No. 3:14-cv-00836-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Jose Ramirez ("Ramirez"), filed this action in Multnomah County Circuit Court alleging that his former employer, defendant Lincare, Inc. ("Lincare"), created a hostile work environment and wrongfully terminated him in retaliation for reporting Lincare's violations of state and federal safety laws. As a result, he alleges claims for violations of the Oregon Safe Employment Act, ORS 654.062(5) (First Claim), violations of Oregon's wage statutes, ORS 652.140–.150 (Second Claim), and potential punitive damages (Third Claim).

On May 22, 2014, Lincare timely removed the action to federal court (docket #1). This court has diversity jurisdiction over the case because Ramirez is an Oregon citizen, Lincare is a

1 – FINDINGS AND RECOMMENDATION

Florida citizen (docket #1, ¶¶ 4–5), and Ramirez seeks over $75,000.00 in damages.  Complaint, ¶ 21(a)–(b).

Lincare has filed a Motion for Summary Judgment (docket #16) against all claims.  For the reasons that follow, Lincare's motion should be granted as to the Second Claim and otherwise denied.

## UNDISPUTED FACTS

Lincare's primary business is the delivery of home medical equipment and oxygen. Complaint, ¶ 1.  Ramirez began working in September 2012 as a driver and service representative at Lincare's Newport Center in Newport, Oregon.  Ramirez Decl. (docket #23), ¶ 1.[1]  He used his Commercial Driver's License ("CDL") to drive Lincare vehicles along the Oregon coast to deliver, set up, and service durable medical equipment and liquid oxygen.  *Id*, ¶¶ 1, 2.  According to the Area Manager, James Taylor ("Taylor"), Ramirez was a "good employee."  Duckworth Decl. (docket #17), Ex. 21 ("Taylor Depo."), pp. 6, 14, 48.  His other supervisors, Kelli Preddy ("Preddy"), Center Manager of the Newport Center effective March 1, 2014, and her predecessor, Kim Mezzenga ("Mezzenga"), found Ramirez to be a good, reliable, and competent employee during the relevant time periods.  *Id*, Ex. 19 ("Mezzenga Depo."), pp. 27-28 & Ex. 20 ("Preddy Depo."), pp. 13-15, 28-29.

Lincare provided Ramirez with a Safety and Regulatory Manual.  Duckworth Decl., Ex. 15; Ramirez Depo., pp. 51–52.  In relevant part, that Manual summarizes the on-duty driving time limits in the Federal Motor Carrier Safety Regulations, 49 CFR §§ 395.0–395.16, as follows:

---

[1] The parties have submitted documents with various attachments.  Citations to declarations and depositions are identified by the last name of the declarant or deponent and citations are to the paragraph(s) of the declaration or the page(s) of the deposition transcript.

> 1. A maximum of 11 cumulative hours of driving, after which drivers must have at least 10 consecutive hours off-duty.
>
> 2. A maximum period on duty of 14 hours, after which drivers must have at least 10 consecutive hours off-duty. Drivers may extend the 14-hour on-duty period by 2 additional hours *if* they:
>
> \> Are released from duty at the normal work reporting location for the previous 5 duty tours, AND
> \> Return to the normal work reporting location and are released from duty within 16 hours, AND
> \> Have not used this exception in the previous 7 days, except following a 34-hour restart of a 7 or 8 day period.

Duckworth Decl., Ex. 15, p. 10.

These limits are commonly referred to as the 11-hour driving rule, 14-hour duty rule, and 16-hour exception. The Manual defines "driving time" as "[a]ll time spent at the driving controls of a commercial motor vehicle in operation." *Id*, p. LIN000638. "On-duty time" is defined as "[a]ll time from the time a driver begins to work or is required to be in readiness to work until the time he/she is relieved from work and all responsibility for performing work." *Id.* A "Note" at the bottom of this same page adds: "'On call' drivers are only 'on duty' when called." *Id*. It is the responsibility of the driver holding a CDL to be aware of these regulations and "to reach out" to a supervisor at Lincare if the driver believes he would be violating the applicable safety regulations. Duckworth Decl., Ex. 4, p. LIN000256; Taylor Depo., pp. 34-35, 37.

Ramirez understood that it was his responsibility to know the vehicle safety policies applicable to his position. Ramirez Depo., p. 27. He understood the policy to mean that he could not work more than 14 hours from the start of his day, which allowed 11 hours of "driving time" and three hours for other activities, such as office work. *Id*¸ p. 57. Ramirez also understood "driving time" to be the period when he started his route to the time that he finished his day. *Id*, p. 61. However, he was uncertain whether "driving time" included the time he spent on breaks or at lunch during the day. *Id*, p. 62.

3 – FINDINGS AND RECOMMENDATION

In about December 2013, Ramirez became concerned that he was asked to drive more hours and that his shifts were longer than permitted by the safety regulations governing commercial drivers. Ramirez Decl., ¶ 3. He and his co-worker, Nygel Hydrick ("Hydrick"), sought clarification from their former Center Manager, Chris Scott ("Scott"), about driving time and the 11-hour driving rule. Ramirez Decpo., pp. 62–63, 65. However, "[i]t wasn't clear what [Scott] had said," and he and Hydrick "always had questions on that . . . because it's confusing, even in the handbook that they give you to study for the CDL." *Id*, pp. 63–64.

By early 2014, Lincare was asking its drivers to drive longer hours apparently because it was "losing customers and [drivers] were expected to try to get new accounts." *Id*, p. 54. Ramirez was driving long hours and occasionally needed to pull over to the side of the road on his shifts because he was so tired. Ramirez Decl., ¶ 7. Due to his concern, Ramirez contacted the Oregon Highway Patrol to clarify exactly what the safety regulations required. *Id*, ¶ 5. Specifically, he wanted to determine if his current driving schedule violated his CDL. *Id.* Highway Patrol referred him to Bonnie Pierovich ("Pierovich") in the Motor Carrier Transportation Division for the Oregon Department of Transportation ("ODOT"). *Id*, ¶¶ 5-6. Ramirez specifically asked Pierovich about the maximum number of hours that he was allowed to drive in a single shift and about the maximum length of any given shift in which he was driving. *Id*, ¶ 6. Pierovich said that when Ramirez's vehicle was placarded, he had to be off the road 14 hours after the start of his day. Ramirez Depo., p. 72.

After speaking with Pierovich, Ramirez believed that his shifts were routinely in excess of the maximum allowable limits. *Id.* Together with Hydrick, he brought his concerns to Mezzenga, an interim Center Manager at the Newport Center and one of his supervisors at the time. *Id*, p. 71; Mezzenga Depo., pp. 7, 32, 39. Although he had previously been a CDL driver,

Mezzenga apparently never received training from Lincare about CDL driving limits and referred Ramirez and Hydrick to Taylor because he was "in charge." Mezzenga Depo., pp. 40-41, 44. Mezzenga also informed Taylor of Ramirez's safety report. *Id*, pp. 45–46.

On February 14, 2014, Ramirez made a second safety complaint to Lincare. *Id*, ¶¶ 9-11. That day, Ramirez started his shift at 5:58 a.m. Taylor Decl. (docket #28), Ex. F. After returning to the office in Newport around 5:00 p.m., Preddy informed Ramirez that two more medical equipment set-ups needed to be done that day in Tillamook and Yachats. Ramirez Decl., ¶ 9. Ramirez estimated, based on his experience, that the drive from Newport to Yachats would take approximately 40 minutes, the set-up would take approximately one hour, and the drive from Yachats to Tillamook would take approximately two hours and 40 minutes. *Id*, ¶ 10. After completing another one-hour set-up in Tillamook, Ramirez would have to drive back to Newport which would have taken another one and a half hours. *Id*. In total, had Ramirez agreed to complete both set-ups as he was asked to do, he calculated that he would have had to work approximately 18 hours that day. *Id*. In addition, Ramirez was scheduled to be on-call that evening. *Id*, ¶ 9.

When Preddy told him he had to drive these shifts, Ramirez informed her that he could not do both set-ups without violating the 11-hour driving rule and the 14-hour duty rule. *Id*, ¶ 11; Ramirez Depo., p. 92. Preddy understood that Ramirez refused to drive because he believed he would be violating the law. Preddy Depo., p. 48. Preddy had never heard of "anything like this" and wanted to know if Ramirez was trying to be funny. *Id*, p. 52. Preddy initially told Ramirez to "stop kidding around," but after realizing that he was not joking, she insisted that he complete the set-ups because the customers were counting on their oxygen. *Id*, p. 92; Ramirez Decl., ¶ 11.

5 – FINDINGS AND RECOMMENDATION

Preddy then called Taylor who, in turn, called Ramirez. *Id*, ¶ 12. Ramirez attempted to explain to Taylor that he could not drive to both Yachats and Tillamook without violating the safety regulations. *Id.* In response, Taylor stressed that Lincare drivers "don't deliver widgets" and questioned whether the job was really meant for Ramirez. *Id*; Taylor Depo., pp. 41-43. He asked Ramirez why he was the "only one who had a problem with driving." Ramirez Decl., ¶ 12; Ramirez Depo., p. 96. Taylor and Ramirez also exchanged some text messages that evening in which Ramirez reiterated that he wanted to keep his job, but could not be on duty for as many consecutive hours as Lincare was demanding. Duckworth Decl., Ex. 17. Taylor apologized, but again stated, "We don't deliver 'widgets'. . . . We are about patient care and need to have that focus." *Id*, p. 2. Taylor tried to explain that there was a 16-hour exception to the 14-hour duty rule. *Id*.

Ramirez agreed to make the delivery in Yachats, but not in Tillamook. Preddy Depo., p. 48. He also remained on-call that night after he returned from Yachats. *Id*, p. 62. Later, Taylor learned that he was wrong about Ramirez's starting time and that Ramirez would have violated the 11-hour driving rule had he also driven to Tillamook. Taylor Depo., pp. 45-46.

After February 14, 2014, Preddy never took the time to understand the regulations nor to sit down with Ramirez to go over the regulations and his safety complaint. Preddy Depo., pp. 63-65. Taylor discussed the safety complaint with Ramirez approximately one week later for "just a few minutes." Taylor Depo., pp. 49-51. Because Ramirez was concerned about retaliation, he decided not to say anything further to his supervisors. Ramirez Decl., ¶ 16. He thought about reporting to someone in human resources or higher management, but never did because he was becoming disillusioned with Lincare. Ramirez Depo., pp. 102-03.

6 – FINDINGS AND RECOMMENDATION

After making his safety complaint on February 14, Ramirez understood that his job was threatened. Ramirez Decl., ¶ 12. He also was ignored, not informed of changes to his schedule, and generally felt that he was treated with less respect and with anger or frustration by Preddy and Taylor. *Id*, ¶¶ 13-15. Ramirez felt that his supervisors thought he was simply uncooperative and were trying to force him to quit. *Id*. Ramirez asked Preddy if she knew whether Taylor was upset with him. *Id*, ¶ 15; Preddy Depo., p. 68. Preddy told him that Taylor was "pissed" with him for refusing to drive. Ramirez Decl., ¶ 15.

Ramirez continued to be given schedules requiring him to drive in excess of the 14-hour duty rule. *Id*, ¶ 16. He continued to feel excluded at work until his termination. *Id*.

Beginning on March 3, 2014, Ramirez began to suffer from health problems, including dizziness and disorientation, which made it difficult for him to work. *Id*, ¶ 17. On Monday, March 10, he called Lincare and reported that he had seen a doctor that morning and was not cleared to work, but that he would provide an update after his next appointment on March 13, 2014. *Id*. Unbeknownst to Ramirez, Lincare put him on a medical leave of absence, effective March 10, 2014. *Id*, ¶ 19; McClendon Decl., Ex. D, p. 2.

Unwilling to violate the safety driving regulations and feeling excluded at work, Ramirez called Preddy on March 12, 2014, to discuss giving his two-week notice after his health issues resolved and he returned to work. Ramirez Decl., ¶ 18. Preddy "seemed excited." *Id*. Believing that Ramirez had given his two-week notice of his resignation, she asked Taylor what to do. Preddy Depo., pp. 73–75; Taylor Depo., p. 22. Taylor directed Preddy to Leslie de Palma ("de Palma"), Regional Administrative Assistant, to "make it happen." Taylor Depo., pp. 22-24. Later that day, Preddy called Ramirez back, stating "this is a good thing," and explained that Lincare would not require a two-week notice, accepted his resignation, and considered his

7 – FINDINGS AND RECOMMENDATION

employment to have ended on March 12, 2014. Preddy Depo., pp. 73-74; Ramirez Decl., ¶ 18; Ramirez Depo., p. 131; Preddy Depo., p. 74. Because Ramirez had anticipated working a few more weeks and had not actually resigned, he texted Preddy the next day for clarification. Duckworth Decl., Ex. 17. Preddy told Ramirez that Lincare had "termed" him. *Id.*

On March 7, 2014, Ramirez had a balance of negative16.00 hours of vacation. De Palma Decl. (docket #18), ¶ 5 & Ex. E. Pursuant to Lincare policy, Ramirez also accrued 18.48 hours of vacation in 2014, which is calculated by the number of pay periods (6) times 3.08 hours of paid vacation for each full pay period worked. *Id*; Duckworth Decl., Ex. 6, p. 7. As a result, Ramirez received pay for 2.48 hours of vacation in his final paycheck. De Palma Decl., ¶ 5 & Ex. E.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FRCP 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). On a motion for summary judgment, the court "draws all justifiable inferences in favor of the non-moving party." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir 2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986). In employment discrimination cases, "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by the factfinder, upon a

full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir 1996) (internal quotations, citation omitted), *cert. denied*, 519 US 927 (1996).

## FINDINGS

### I.   Evidentiary Objections

Pursuant to LR 56-1(b), both parties included evidentiary objections (titled "Motion to Strike") in their response and reply memoranda. Plaintiff's Response (docket #22), p. 20; Defendant's Reply (docket #27), p. 12.

Ramirez seeks to strike portions of his deposition transcript regarding statements made by Pierovich, the Truck Inspection Training Coordinator at ODOT, as inadmissible hearsay. However, Lincare seeks to admit these statements only as evidence that Ramirez could not have believed in good faith that he was driving in violation of the law because he knew the statutory time limits. For that limited purpose, these statements are not hearsay and may be considered.

Lincare seeks to strike the following evidence regarding the Oregon Employment Department ("OED") decision to award Ramirez unemployment benefits: (1) paragraph 20 in the Ramirez Declaration (docket #23); (2) Exhibit E to the McClendon Declaration (docket #24) (OED Administrative Decision awarding benefits and finding that Ramirez "was discharged because he advised the employer that he intended to quit his job"); and (3) Exhibit F to the McClendon Declaration (final order of the Administrative Law Judge finding that Ramirez "did not quit his job on March 12, 2014."). Pursuant to ORS 657.273(2), "the decisions, findings, conclusions, final orders and judgments that arise" from administrative unemployment benefits hearing are "not admissible as evidence in any other civil action or proceeding other than civil actions or proceedings under this chapter or in determination of eligibility for public assistance

or supplemental nutrition assistance." Ramirez does not dispute that this evidence is inadmissible under that statute. Thus, it is stricken and will not be considered.

## II.     Violation of ORS 654.062 (First Claim)

Pursuant to ORS 654.062(5), a person is prohibited from discriminating or retaliating against "any employee" who has "[o]pposed any practice forbidden by," "[m]ade any complaint . . . related to," or "[e]xercised on behalf of the employee, prospective employee or others any right afforded by" the Oregon Safe Employment Act. The First Claim alleges that Lincare violated ORS 654.062(5) by creating a hostile work environment and ultimately terminating Ramirez's employment in retaliation for Ramirez making safety complaints, opposing unsafe work conditions, and exercising his legal rights.

### A.     Protected Activity

Ramirez made two reports of safety violations to his supervisors: (1) the first in early 2014 when he told Mezzenga that his shifts and driving requirements exceeded legal limits; and (2) another on February 14, 2014, when he refused a driving assignment that would have caused him to exceed his daily driving limits. Lincare seeks summary judgment against the First Claim based on the lack of any evidence that Ramirez complained about or opposed any safety violations in good faith.

Ramirez testified that he exceeded the 11-hour driving rule during 50% of his employment with Lincare. Ramirez Depo., pp. 53-54. If true, then his safety complaints were clearly made in good faith. However, Lincare deems Ramirez's statement to be unbelievable due to the lack of any supporting documentary evidence. Each driver, including Ramirez, filled out a daily Delivery & Fill Log. Taylor Depo., p. 37. Yet Ramirez has submitted only one log dated February 28, 2014, that shows him driving more than 14 hours (15 hours and 36 minutes).

10 – FINDINGS AND RECOMMENDATION

McClendon Decl. (docket #24), Ex. G.  Lincare has submitted two other logs kept by Ramirez that show him driving more than 14 hours dated January 9, 2014 (14 hours and 39 minutes) and February 19, 2014 (15 hours and 50 minutes).  Duckworth Decl., Ex. 16, pp. 1-2.  However, Lincare argues that all three logs fall into the 16-hour exception because none occurred within seven days of each other.  In addition, based on their cursory review of some logs, neither Mezzenga nor Taylor found any logs that showed excessive hours or anything out of the ordinary.  Taylor Depo., pp. 63–64; Mezzenga Depo., pp. 33–37.  However neither supervisor conducted a thorough investigation.  *Id*.  Without a complete review and analysis of all of Ramirez's logs, the record is unclear as to whether and, if so, how often Lincare committed any actual safety violations.

In any event, Ramirez need not prove any actual violation of any law, regulation, or standard by Lincare.  The Oregon Court of Appeals reads the statute to require the protected activity to "simply 'relate' to the Oregon Safe Employment Act" and allows a plaintiff "to establish that he suffered discrimination at his employment because he made a complaint 'related to' a safe and healthful working condition."  *Butler v. State*, 138 Or App 190, 201, 909 P2d 163, 171 (1995).  In general, statutory retaliation claims in Oregon require a showing that plaintiff had a "good faith belief" that a violation has occurred.  *See McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or App 107, 111, 684 P2d 21, 24 (1984), citing ORS 654.062(5).

The evidence submitted by Ramirez is sufficient to create a genuine issue of material fact that he acted in good faith when making complaints about and opposing perceived safety violations.  First, Taylor and Preddy asked Ramirez to drive more than 14 hours on February 14, 2014, and he refused.  Taylor now acknowledges that asking Ramirez to drive to both Tillamook and Yachats at the end of his shift would have violated the 14-hour duty rule.  Taylor Depo.,

11 – FINDINGS AND RECOMMENDATION

pp. 45-46.  That trip, if driven by Ramirez as requested by his supervisors would have occurred five days prior to February 19, 2014, on which Ramirez drove 15 hours and 50 minutes.  Duckworth Decl., Ex. 16, p. 2.

Although Ramirez was required by his CDL and training, as well as by the terms of his employment, to know and understand the driving limits imposed by law, he was confused about how much of his work day counted toward the driving limits.  Reading the portion of the Manual titled "On Duty Driving Time Limits," Ramirez understood that he had 11 hours of driving time and three hours for activities such as office work.  Ramirez Depo., pp. 52, 77.  However, he believed driving time to be "from the time that [he] left the shop to start my route to the time that [he] returned to the shop to finish my day."  *Id*, pp. 61-62.  He was not sure whether "the hour or half hour that [he took] for lunch [was] included [in] that driving time."  *Id*, p. 62.  In 2013, Ramirez and Hydrick, sought, but failed to receive, clarification from Scott, the Center Manager at that time, about driving time and the 11-hour driving rule.  *Id*, pp. 62-63, 65.

In early 2014, after Lincare asked its drivers to start driving longer hours, Ramirez again sought clarification about the driving rules from his new supervisor, Mezzenga, and the ODOT representative, Pierovich.  *Id*, pp. 54, 71-72.  Apparently neither addressed the specific question of whether lunch was included in the 11-hour driving rule or whether on-call duty was included in the 14-hour duty rule, but Ramirez did learn from Pierovich that driving did not involve office time.  *Id*, pp. 72-73.  Mezzenga had no answer and referred Ramirez and Hydrick to Taylor.  Mezzenga Depo., p. 38.

Even though it was Ramirez's responsibility to understand the rules, his attempts to obtain clarification from supervisors and the ODOT were unsuccessful.  The Manual, stating nothing specific about lunch or other breaks, was arguably unclear.  His fellow driver, Hydrick,

was uncertain of the rules. Even Mezzenga, a former CDL driver, was unfamiliar with the driving regulations. Based on this evidence, a jury could find that, even without documentation of an actual violation, Ramirez believed in good faith based on his interpretation, though mistaken, of the driving regulations that Lincare repeatedly required him to violate the law.

Finally, Lincare points out that Ramirez failed to report any alleged violations to Pierovich. When Ramirez spoke with Pierovich for clarification about the safety driving regulations, he said his logs showed excess driving. Ramirez Depo., p. 73. Pierovich encouraged him to send proof of the violations to investigate. *Id.* Ramirez did not follow up with her or send any documents. *Id*, pp. 73, 84. However, his hesitation does not prove lack of good faith. He has explained that he was becoming disillusioned with Lincare (*id*, pp. 102-03), and was concerned about retaliation. Ramirez Decl., ¶ 16. These feelings would have dissuaded Ramirez from reporting violations to Pierovich.

For these reasons, a genuine dispute exists as to whether Ramirez engaged in protected activity under ORS 654.026(5).

    **B.**    <u>**Hostile Work Environment**</u>

        **1.**    <u>**Severe and Pervasive Conduct**</u>

Ramirez alleges that after February 14, 2014, in retaliation for reporting and opposing safety concerns, Taylor and Preddy intentionally created an intolerable work environment to force him to quit, and then terminated him before he could do so. Complaint, ¶¶ 8–10. In the context of an employment discrimination claim, a hostile work environment requires plaintiffs to prove harassing behavior that is "sufficiently severe or pervasive to alter the conditions of [their] employment." *Pennsylvania State Police v. Suders*, 542 US 129, 133 (2004) (citations omitted).

Lincare argues that Taylor and Preddy's conduct was not sufficiently severe and pervasive to create a hostile working environment.

After February 14, Ramirez no longer felt part of the team and claims that his supervisors avoided him because they considered him uncooperative. Ramirez Decl., ¶ 14. They ignored and excluded him from important information affecting his driving schedule, such as the change in the provider and location for picking up the liquid oxygen that Ramirez delivered. *Id*, ¶ 13; Ramirez Depo., p. 143. Although no one ever gave him any dirty looks or made disparaging comments, the cold shoulder from his supervisors made it clear to him that they were trying to force him to quit. Ramirez Decl., ¶ 14; Ramirez Depo., pp. 142-43 ("you don't have to hear. You can see by body language and just facial expressions . . . that things had changed"). When asked if she knew whether Taylor was upset with him, Preddy replied that Taylor was "pissed" with him for refusing to drive. Ramirez Decl., ¶ 15.

Ramirez argues that the timing of Taylor and Preddy's harassment accentuates its severity. He endured this treatment over one month between the February 14 incident and March 12 when he was terminated. During that time, he believed his job was threatened and became concerned about Taylor and Preddy retaliating against him. *Id*, ¶¶ 12, 16. His increasing disillusionment prevented him from reporting the safety violations to human resources. Ramirez Depo., pp. 102-03. Finally, in early March while on sick leave, Ramirez decided that he would quit after he returned from leave. Ramirez Decl., ¶ 18. He "was tired of being excluded at work and treated with suspicion and [he] was unwilling to drive in violation of the law." *Id.*

Based on this evidence, a genuine issue of fact exists as to whether the alleged conduct was sufficiently severe and pervasive to constitute a hostile work environment.

///

14 – FINDINGS AND RECOMMENDATION

**2.     Termination**

Lincare also argues that Ramirez cannot prove that his termination was motivated by retaliation. De Palma made the decision to terminate Ramirez on March 12, 2014, without allowing him to return to work during a two-week notice period. De Palma Decl., ¶ 3. She made this decision based on an email and discussion with Preddy informing her that Ramirez had given his two weeks' notice, had blood pressure issues, felt his job was too difficult, and was going to put his notice of resignation in writing. *Id*, ¶ 3 & Ex. A. She did not participate in Taylor and Preddy's harassment or know that Ramirez had reported any concerns or made any complaints regarding safety, unsafe work conditions, or his belief that he was required to drive in excess of the legal driving limits. *Id*, ¶ 4.

However, the Ninth Circuit has held "that if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." *Poland v. Chertoff*, 494 F3d 1174, 1182 (9th Cir 2007). De Palma's decision would never have been made without Preddy notifying her that Ramirez had resigned. De Palma's emails from that day show that she believed and relied on Preddy's characterization that Ramirez resigned during the March 12 telephone call with Preddy. De Palma Decl., Ex. C, pp. 2-3. Unlike De Palma, Preddy was aware of Ramirez's safety complaints and had a motive to retaliate after Ramirez refused to drive the extra routes she assigned on February 14. Whether Preddy correctly interpreted Ramirez's intentions or construed his request as a resignation in retaliation

15 – FINDINGS AND RECOMMENDATION

for his report of or opposition to safety violations and prematurely ended his employment is a disputed material fact.

Thus, summary judgment should be denied as to the First Claim.

### III.    Wage Claim (Second Claim)

Lincare seeks summary judgment against Lincare's wage claim on the basis that it paid Ramirez all vacation time he accrued as of March 12, 2014, his last day of employment. Ramirez argues that Lincare wrongfully refused to credit the vacation time he accrued during his two-day absence from work (March 10 to 11) and, although not alleged in the Second Claim, denied him at least two more weeks of paid employment by terminating him early on March 12, 2014.

According to Lincare's Employee Handbook, a full-time employee "will earn approximately 3.08 hours of paid vacation for each *full* pay period worked." Duckworth Decl., Ex. 6, p. LIN000269 (emphasis added). Employees are paid biweekly on Friday "with 26 pay periods annually" ending on Sunday. *Id*, p. LIN000273. As of March 9, 2014, the end of a two-week pay period, Ramirez had accumulated 18.48 hours of vacation (six pay periods multiplied by 3.08 hours of paid vacation each), but had taken 16.00 hours of vacation prior to March 7, 2014. DePalma Decl., ¶ 7 & Ex. D. As of March 9, 2014, his vacation balance was 2.48 hours. *Id*, ¶ 7. In the final paycheck, Lincare paid Ramirez for all of his accrued vacation time through March 9, 2014. *Id*.

The issue raised by this claim concerns the accrual of vacation time after March 9, 2014. When Lincare was absent from work for medical reasons starting March 10, 2014, Lincare granted Ramirez an unpaid leave of absence without his knowledge or consent.[2] *Id*, Ex. C, p. 1.

---

[2] Apparently Lincare does not have sufficient employees to required compliance with either the FMLA or the OFLA.

As shown by a series of emails, Lincare reasoned that because he was out on medical leave and never "returned" from medical leave, he accrued no vacation time after March 9, 2014. *Id*, pp. 1-3. However, according to Lincare's policies, ending his employment on March 12, before the end of the next two-week pay period on March 23, was the reason he accrued no vacation time during his absence from work. Without completing that two-week pay period, he could accrue no vacation time, even for the two days (March 10 and 11) he was absent immediately prior to his last day of employment. Accordingly, given his last day of employment on March 12, 2014, Lincare paid Ramirez all accrued vacation time and, thus, did not violate any Oregon wage law.

Although not pled, Ramirez appears to contend if he had not been terminated early, but had been allowed to return to work, give his two-week notice and work during that time, he would have earned additional wages and accrued more vacation time by completing another pay period. However, that contention is more properly characterized as a claim for damages arising from his allegedly unlawful termination alleged in the First Claim. That contention cannot support a claim for failing to pay all wages earned and unpaid at the time of termination as required by ORS 652.140(1) because those wages were not earned as of March 12, 2014.

Therefore, Lincare should be granted summary judgment against the Second Claim.

### III.   Punitive Damages (Third Claim)

The Third Claim is not a separate claim, but merely a notice that Ramirez may amend his Complaint to add a claim for punitive damages. Therefore, it is not subject to summary judgment at this juncture.

///

///

///

## RECOMMENDATION

For the reasons stated above, Lincare's Motion for Summary Judgment (docket #16) should be GRANTED against the Second Claim and otherwise DENIED.

## SCHEDULING ORDER

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due Monday, May 04, 2015. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED  April 16, 2015.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge
